1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT BARBOUR, | Case No.  1:18-cv-0246-NONE-BAM (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION TO DISMISS |
| v. | |
| UNITED STATES, | ORDER DENYING REQUEST TO OPEN DISCOVERY |
| Defendant. | (ECF No. 18, 19) |
| | **FOURTEEN (14) DAY DEADLINE** |

## I.    <u>Introduction</u>

Plaintiff Scott Barbour ("Plaintiff") is a federal prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The action was initially designated as a prisoner civil rights action, and was later redesignated as a regular civil action and reassigned to the undersigned Magistrate Judge.  (ECF No. 11.)

On August 21, 2019, Defendant filed a motion to dismiss the first amended complaint for lack of subject matter jurisdiction.  (ECF No. 18.)  Plaintiff filed his opposition on September 18, 2019, (ECF No. 20), and Defendant filed a reply on September 25, 2019, (ECF No. 21).  Plaintiff also filed a motion for an order opening discovery on September 18, 2019, (ECF No. 19), which Defendant opposed on September 25, 2019, (ECF No. 22).  The deadline for the filing of

1

Plaintiff's reply, if any, has not yet expired.

For the reasons discussed below, the Court recommends that Defendant's motion to dismiss be granted in part and denied in part.

**II.      Summary of Relevant Allegations**

Plaintiff is currently housed at the United States Penitentiary Canaan in Waymart, Pennsylvania.  The events in the complaint are alleged to have occurred while Plaintiff was housed at the United States Penitentiary Atwater ("USP Atwater") in Atwater, California. Plaintiff names the United States of America as the sole defendant and asserts claims for negligence/personal injury arising out of a race riot that occurred at USP Atwater on July 24, 2015.  Plaintiff brings claims in the Complaint under the Federal Tort Claims Act ("FTCA"), for negligence.

Plaintiff alleges as follows:

> On July 24, 2015, at USP Atwater, a race riot broke out on the recreation yard and in several of the housing units.  After the violence on the yard broke out, the Center Tower guard, in contravention of his Post Orders, the relevant policy statements, and numerous entreaties from his lieutenant and fellow staff members, failed to take any actions to quell the violence, which resulted in several inmates, including Plaintiff, receiving serious injuries.  Further, Recreation Specialist McIntire acted negligently when he locked the gate between Yards Two and Three, thus precluding the escape from the violence by the inmates, including Plaintiff, who were under attack.  [¶] Relevant to the Center Tower guard, Plaintiff subsequently asked him why he had failed to fire any shots.  He responded by stating: "I don't think you would have fired into your own people, either."  (The tower guard is of the same race and ethnicity as the aggressors in the riot.)

(Doc. No. 9 at 3-4.)

Plaintiff further alleges:

> Finally, Captain Garcia, who at the time of the riot oversaw, inter alia, the Compound area of USP Atwater, and Recreation Supervisor Pedraza, who at the time of the riot oversaw, inter alia, the outside recreation areas of USP Atwater, failed, respectively, to ensure that the compound and the outside recreation areas had the number of staff members posted to those areas that was required by post orders, policy, and directives.  At the outset of the riot in question the aggressors threw unopened cans of soda at the victims, including Plaintiff, for several minutes before attacking at close quarters with pipes and homemade knives. During this time there were no recreation staff on Yard 3 (the Yard the riot had occurred on), and there were no Compound staff anywhere in the vicinity of the riot.  Also during this soda-throwing period, no staff members activated their emergency duress devices, and thus no staff responded to the attack until well

2

after the close quarter attack had commenced.  Because no staff responded until well after the close quarter attack had commenced, several inmates, including Plaintiff, suffered serious injuries.  And no staff responded because, as state above, there were no staff members on Yard 3 or in close proximity on the Compound to see the outset of the attack. And there were no staff members on Yard 3 or in close proximity on the Compound because the recreation yard and the Compound did not have the number of staff members required by post orders, policy, and directives, thus staff failed to patrol the rec yard and compound, resulting in Plaintiff's injuries.

(Id. at 4-5.)

Plaintiff contends that as a result of these negligent acts, he was stabbed three times and suffers from post-traumatic stress disorder.  He seeks $5,000,000.00 in damages.

## III.      Federal Torts Claim Act and the Discretionary Function Exception

### A.      Legal Standards For 12(b)(1) Motion

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Federal Rule of Civil Procedure 12(b)(1) allows a defendant to raise the defense, by motion, that the court lacks jurisdiction over the subject matter of an entire action or of specific claims alleged in the action. "A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

When a Rule 12(b)(1) motion attacks the existence of subject matter jurisdiction, no presumption of truthfulness attaches to the plaintiff's allegations. *Thornhill Publ'g Co.,* 594 F.2d at 733. "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). When a Rule 12(b)(1) motion attacks the existence of subject matter jurisdiction in fact, plaintiff has the burden of establishing that such jurisdiction does in fact exist. *Thornhill Publ'g Co.,* 594 F.2d at 733.

A Rule 12(b)(1) motion will be granted if the complaint, when considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039-40 n.2 (9th Cir. 2003); *Thornhill Publ'g Co. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). Challenges to jurisdiction under

3

1   Rule 12(b)(1) may be facial (i.e., on the pleadings) or factual, permitting the court to look beyond

2   the complaint. *Savage*, 343 F.3d at 1039-40, n.2; see also *White v. Lee*, 227 F.3d 1214, 1242 (9th

3   Cir. 2000). In a factual challenge, "the district court is not restricted to the face of the pleadings,

4   but may review any evidence, such as affidavits and testimony, to resolve factual disputes

5   concerning the existence of jurisdiction*." McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.

6   1988); *see also Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983)

7   (consideration of material outside the pleadings did not convert a Rule 12(b)(1) motion into one

8   for summary judgment).

9            **B.      Federal Tort Claims Act**

10          The FTCA provides for recovery of money damages against the United States for

11   cognizable state or common law torts committed by federal officials while acting within the scope

12   of their employment. 28 U.S.C. §§ 1346(b), 2674. The FTCA provides that the United States

13   shall be liable in tort suits "in the same manner and to the same extent as a private individual

14   under like circumstances." 28 U.S.C. § 2674. It is the exclusive waiver of sovereign immunity for

15   suits against the United States sounding in tort. 28 U.S.C. § 1346(b).

16          The FTCA can extend tort liability to the U.S. government if the facts show that the

17   actions taken amount to negligence under state law. Under California law, negligence is

18   established if the plaintiff can show that his injury is a result of the defendant's breach of a duty

19   of care. *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 294 (1988).

20           **C.      The Discretionary Function Exception**

21          However, the FTCA waiver of immunity is inapplicable to a claim based on the exercise

22   of a discretionary function on the part of a federal agency or employee. *Childers v. United States*,

23   40 F.3d 973, 974 (9th Cir. 1995) (citing 28 U.S.C. § 2680(a)); *Terbush v. United States*, 516 F.3d

24   1125, 1128 (9th Cir. 2008). This is true "whether or not the discretion is abused." *Miller v. United*

25   *States*, 163 F.3d 591, 593 (9th Cir. 1998). In creating the discretionary function exception (DFE),

26   Congress "wished to prevent judicial 'second-guessing' of legislative and administrative

27   decisions grounded in social, economic, and political policy through the medium of an action in

28   tort." *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984).

Under the discretionary function exception, the government retains sovereign immunity for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court established a two-step inquiry to determine whether the discretionary function exception applies. *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). "First, a court examines whether the government's actions are 'discretionary in nature, acts that involv[e] an element of judgment or choice.'" *Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015), *cert. denied* 136 S.Ct. 2008 (2016) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). "If there is ... a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive." *Id.* (quoting *Terbush*, 516 F.3d at 1129). Second, "a court must determine whether that judgment is of the kind that the discretionary function was designed to shield." *Berkovitz*, 486 U.S. at 536. "To survive a motion to dismiss, [a plaintiff] must 'allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Terbush*, 516 F.3d at 1130 (emphasis omitted) (quoting *Gaubert*, 499 U.S. at 324-25). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267.

Congress expressly reserved the sovereign immunity of the United States as to such claims, and therefore, federal courts lack jurisdiction over any claim to which the discretionary function applies. *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002). Although the plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, the government bears the burden of establishing that the discretionary function applies. *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996); *Miller*, 163 F.3d at 594.

**D.   *Ruby v. United States***

Both Plaintiff and Defendant rely on *Ruby v. United States*, No. 1:18-CV-00200-SAB PC,

5

1    2019 WL 2089498, at *3 (E.D. Cal. May 13, 2019),[1] *appeal dismissed sub nom. Ruby v.*

2    *Matevousian*, 2019 WL 8059525 (9th Cir. Dec. 9, 2019), a case by another inmate who was

3    injured in the same riot at USP Atwater as Plaintiff.  Since both parties alternatively rely upon

4    and distinguish *Ruby*, the Court summarizes that case.

5           In *Ruby,* Plaintiff, also injured in the same riot, argued that the BOP Program Statements

6    and regulations required the use of immediate force to quell the prison disturbance, relying on 28

7    C.F.R. § 552.21(a). Plaintiff argued that the attack could have been avoided had prison officials

8    implemented BOP policy to use immediate force and that the gates had not been locked which

9    prevented escape. Plaintiff argued that the gun tower is outfitted with lethal weapons, however,

10   tower staff failed to implement the use of firearms. Staff even failed to fire a warning shot. At the

11   base of the gun tower are sandbags, which can be used for warning shots, so a bullet will not

12   deflect and harm others; prison officials breached their duty by not even firing a warning shot.

13   *Ruby,* 2019 WL 2089498, at *1.

14          The court in *Ruby* held that the actions plaintiff the challenged involved an element of

15   judgment or choice.  BOP Program Statement 5566.06 provides that "immediate or unplanned use

16   of force by staff is required when an inmate is ... assaulting any other person to include other

17   inmates,"  but the court stated that Program Statement 5566.06 does not mandate any particular

18   type of immediate or unplanned force. Under 28 C.F.R. § 552.20, BOP authorizes staff to use

19   force only as a last alternative after all other reasonable efforts have failed. In this instance, the

20   BOP exercised its discretion and used pepper spray to quell the disturbance.  The court stated that

21   there is no regulation or Program Statement that requires the use of a warning shot or lethal force

22   to quell a prison disturbance.  Thus, the court found that the challenged action involves element

23   of judgment or choice.

24          The court in *Ruby* also held that challenged action is the type Congress meant to protect

25   under the discretionary function exception.  Quelling a prison riot "is a classic example of an

26   activity requiring the exercise of discretion .... We do not believe that Congress meant for judges,

27

28   _____

     [1] This case is also referred to by the parties as *Ruby v. Matevousian.*

1    through hindsight, to second-guess such difficult decisions." *Ruby,* 2019 WL 2089498, at *4,

2    citing *Buchanan v. United States*, 915 F.2d 969, 972 (5th Cir. 1990).  The court held that the

3    decisions made by BOP officials were grounded in public policy, namely, assuring the safety and

4    security of inmates and efficiently managing the prison.  Therefore, the court recommended that

5    the motion to dismiss for lack of subject matter jurisdiction be granted, which was adopted by the

6    District Court.  *Ruby v. United States*, No. 1:18-CV-00200-SAB PC, *Order adopting Findings*

7    *and Recommendations to dismiss case*, *Ruby v. United States*, No. 1:18-CV-00200-DAD-SAB

8    PC, ECF No. 36.

9    **IV.    Defendant's Motion to Dismiss**

10         **A.    Defendant's Moving Arguments**

11         The United States asks the Court to dismiss this case for lack of subject matter jurisdiction

12    pursuant to the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). Defendant

13    argues that the prison's response to the riot involved an element of judgment or choice. The rules

14    governing the use of force are set for in 28 C.F.R. 28 C.F.R. § 552.20 et seq.,[2] and two Bureau of

15    Prisons Program Statements -- Program Statement 5566.06 and 5500.12.  The Bureau of Prisons

16    authorize staff to use force only as a last alternative, after all other reasonable efforts have failed.

17    The C.F.R distinguishes between immediate and calculated uses of force. Immediate force may

18    be used when behavior constitutes an immediate, serious threat to person or property or security.

19    28 C.F.R. § 552.21(a).[3]  Calculated use of force is employed in situations where there is no

20    immediate, direct threat to the inmate or others.  28 C.F.R. § 552.21(b).[4]  The amount of force

21
22    [2] See 28 C.F.R. § 552.20 states in relevant part, "The Bureau of Prisons authorizes staff to use force only as a last
      alternative after all other reasonable efforts to resolve a situation have failed. When authorized, staff must use only
23    that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff, and
      others, to prevent serious property damage and to ensure institution security and good order."

24    [3] See 28 C.F.R. § 552.21states,  "(a) Immediate use of force. Staff may immediately use force and/or apply restraints
      when the behavior described in § 552.20 constitutes an immediate, serious threat to the inmate, staff, others, property,
25    or to institution security and good order."

26    [4] 28 C.F.R. § 552.21 states,  "(b) Calculated use of force and/or application of restraints. This occurs in situations
      where an inmate is in an area that can be isolated (e.g., a locked cell, a range) and where there is no immediate, direct
27    threat to the inmate or others. When there is time for the calculated use of force or application of restraints, staff must
      first determine if the situation can be resolved without resorting to force."

28

1   authorized is only the amount necessary to gain control of the inmate.  28 C.F.R. § 552.22(a)

2   ("Staff ordinarily shall first attempt to gain the inmate's voluntary cooperation before using

3   force."), (c) ("Staff shall use only that amount of force necessary to gain control of the inmate").

4   Defendant argues that within these parameters, the force an officer uses and decisions about the

5   type of force required is within the discretion of the officer and is based on the officer assessment

6   of the situation, and the officers experience and sound judgment. BOP's Program Statement

7   5500.14 provides for the use of firearms only when deemed necessary to prevent escape, loss of

8   life or physical injury or to restore security.  Use of firearms are considered a last measure, when

9   all available means have failed.

10   Defendant argues that the regulations and Program Statements do not set forth pre-tailored

11   mandated responses to a situation, but direct that use of force and type of force depend upon a

12   myriad of factors. The regulations and Program Statements do not direct when the use of lethal

13   weapons or a warning shot must be used to quell prison disturbances, as Plaintiff alleges. Staff are

14   trained to evaluate each situation to apply the amount of force necessary to resolve the situation.

15   To the extent Plaintiff's claim rests on insufficient staff assigned to the yard, this claim is

16   precluded by the discretionary function exception, citing *Mitchell v. United States,* 149 F.Supp.2d

17   1111 (D. Ariz. 1999). Discretionary decisions such as the number of guards to employ,

18   emergency alarms and tactical choices in moving inmates in the institution are within the

19   discretionary function exception. In any claim that insufficient staff were present to intervene

20   during the riot attacks, the discretionary decision exempts how to deploy limited resources, citing

21   numerous authorities such as *Alfrey v. United States*, 276 F.3d 557 (9th Cir. 2002)("[i]t is clear

22   that balancing the need to provide inmate security with the rights of inmates to circulate and

23   socialize within the prison involves considerations based upon public policy.")

24   Defendant also asks the Court to take judicial notice of various documents.  See ECF No.

25   18-2, including (1) the declaration of Joshua Brown filed in the case styled *Ruby v. United States*;

26   (2) Declaration of Gerald Del Re also filed in the *Ruby v. United States*, (3) an Appendix

27   containing Program Statements also filed in *Ruby v. United States*, and (4) the findings and

28

1  recommendations regarding Defendant's Motion to Dismiss filed *Ruby v. United States*.[5]

2        **B. Plaintiff's Opposition to Motion to Dismiss**

3        Plaintiff has four main complaints about how the riot was handled: (1) the tower guard did

4  nothing to quell the riot and must immediately use force when staff witness an inmate being

5  assaulted, (2) the tower guard did not employ any force based on racial discrimination, (3) staff

6  closed and locked the gate which precluded any means for the attacked inmates from retreating,

7  and (4) staff failed to patrol the recreation yard.

8        Plaintiff argues that the case relied on by the Government, *Ruby v. Matevoisian*, 1:18-cv-

9  0200 LJO SAB, is distinguishable. Plaintiff argues that the correct argument is that Program

10  Statement 5566.06 <u>requires</u> the <u>immediate</u> use of force by staff when an inmate is trying to inflict

11  injury on another which may be life threating or assaulting another inmate. The employee had no

12  choice but to obey the binding regulations, but did not in the riot. *Ruby v. Matevoisian* is

13  distinguishable because the plaintiff in that case did not argue, as Plaintiff here does, that staff

14  may have discretion to deal with <u>threats</u> of force, but where an inmate is being assaulted in the

15  presence of staff, staff <u>must</u> employ force.

16        Plaintiff argues that threat to an inmate allows staff the discretion how to deal with the

17  threat. (ECF No. 20, p.10.) But section 552.20 does not confer any discretion regarding use of

18  force when staff witnesses an assault in progress. Plaintiff argues that the Court in *Ruby*

19  incorrectly interpreted the regulation, assigning discretion in gaining control of an inmate.

20  Plaintiff's argument is that Program Statement 5566.06, does not mandate a particular use of

21  force, but mandates immediate use of force when staff witness an inmate being assaulted.  The

22  tower guard was required to employ an immediate use of some type of force, not any <u>particular</u>

23  <u>type</u> of force, but some type of force.  The tower guard employed no force.  Staff do not have

24  unfettered discretion on how to deal with an assault in progress – they could not leave an inmate

---

25

26  [5] Federal Rule of Evidence 201(d) permits the Court to "take judicial notice at any stage of the proceeding." "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy

27  cannot reasonably be questioned." Fed. R. Evid. 201(b).The Court may take judicial notice of the files in that case. Fed. R. Evid. 201.  In addition, since Rule 12(b)(1) permits the Court to consider factual evidence presented, the

28  Court will consider the facts presented in the documents.

1   being beaten while staff go have lunch and deal with the problem later.  They must employ force.

2   The mere existence of the directive to use force is enough to defeat the discretionary function

3   exception.  The tower guard and the recreation and compound staff acted negligently with respect

4   to the race riot.  The tower guard had lethal and less than lethal munitions he could have used.

5   Yet, the guard did nothing to stop the attacks, which violated his post orders and 5566.06.

6   　　　　The tower guard's actions were motived by racial/ethnic discrimination ("I don't shoot

7   into my own.")[6]  It does not matter that 10 minutes later, staff on the ground stopped the attacks.

8   He did not use force against a group of inmates with whom he shared a common ethnicity.

9   Further, Plaintiff argues that the tower guard was given a direct order to shoot, but did not follow

10  this directive.[7] *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (government conduct

11  cannot be discretionary if it violates a legal mandate.) The plaintiff in *Ruby v. Matevoisian* did not

12  present evidence that the tower guard was given a direct order to shoot.  The tower guard had a

13  duty to act, and use any force, but instead used no force.

14  　　　　Officer McIntyre locked the gates eliminating any means of retreat.  Inmates faced with

15  the threat could not simply walk away because Officer McIntyre, whose post order required him

16  to leave the yard gates open, locked the case, barring the only means of escape.  Even if he had

17  discretion to lock the gates, it is not reasonable to lock 32 inmates in a confined space with over

18  100 armed inmates.  (ECF No. 20, p.17.)

19  　　　　Plaintiff also claims that the staff who were assigned to the recreation yard failed to patrol

20  their assigned areas in violation of their post orders, policy and directives. It was as a result of

21  their failure and in attentiveness that caused them not to notice the events leading up to the riot.

22  In *Ruby v. Matevoisian,* the plaintiff did not present evidence that the recreation/compound staff

23

24  [6] Plaintiff presents a declaration of inmate Donovan Slagg, who overheard a conversation held after the riot between
    Plaintiff and Officer Rosales, the tower guard.  Witness Slagg states: that Officer Rosales responded to a question of
    why he did not fire any shots during the race riot, "I don't think you would have shot into your own people either."

25  (ECF No. 20, p. 27 of 28).  Plaintiff attributes discriminatory intent on Officer Rosales' part.

26  [7] Plaintiff also presents evidence that Captain Garcia gave a direct order for the tower guard to shoot but the tower
    guard did not. Plaintiff presents the declaration of inmate Bryan Bowen, who was also injured in the riot, heard and

27  saw Captain Garcia screaming into this handheld radio "Goddamit shoot! Shoot! Shoot!"  Plaintiff argues that
    Captain Garcia's verbal command to the tower guard to employ force was sufficient to strip the tower guard of any

28  discretion, and with it any protection of the discretionary function exception.  (ECF No. 20, p. 24.)

10

1    were not patrolling their assigned areas.  Cases dealing with decisions about where staff should be

2    assigned are not relevant.  Plaintiff cites cases which hold that the discretionary function

3    exception does not bar claims based on allegation that prison guard failed to patrol, cases cited at

4    ECF No. 20 p. 18.  Plaintiff cites to other Program Statements which require that staff must stay

5    alert, staff is responsive for inmates.  *Id; see e.g., Padilla v. United States,* 2012 WL 12882367

6    (C.D. 2012).

7              C.       **Government's Reply to Plaintiff's Opposition**

8              Defendant contends that the Prison's response to the riot involved an element of judgment

9    or choice.  Plaintiff admits that BOP staff have discretion on how to deal with threats of violence,

10   which "may" include force to gain control.  The Program Statement does not mandate the use of

11   particular type of force.  In this case, BOP staff exercised their discretion to use pepper spray to

12   quell the prison disturbance.

13             Defendant argues that Plaintiff takes the position that the tower guard, even in the

14   presence of the use of pepper spray by other BOP staff, had no discretion and was mandated to

15   use force to stop the riot.  There is no regulation or Program Statement that requires the use of

16   warning shot to quell a disturbance.  BOP employs various tools and tactics short of firing to

17   quell disturbances before resorting to firearms.

18             Plaintiff also raises the issue that the gate was locked to prevent the riot from spreading.[8]

19   No post or regulation requires BOP staff to be at a specific location.  Plaintiff does not contend

20   there were insufficient staff posted or that the staff were absent.  Rather, he argues that post order

21   would have required staff to be at a specific location.  No such post or regulations exist.

22             The government argues that the challenged action is of the type Congress meant to protect

23   under the discretionary function exception. Case law is uniform in holding that decisions

24   regarding the safety of inmates and the use of force even if incorrect are discretionary matters,

25   citing *Alfrey*, 276 F.3d 557 and other cases.[9]

---

26   [8] Plaintiff argues that it took 9-10 minutes to quell the riot, but Defendant argues that BOP calculated the time that
     the violence was identified by staff until the time it ended, at three minutes.  (ECF No. 21, p.3.)

27

28   [9] Plaintiff filed a "response" to Defendant's reply brief. (Doc. 24). The Eastern District of California's Local Rules
     230 does not authorize the filing of a response to a reply.  See Local Rule 230 (a)-(c), (l). While Plaintiff's response

1   **V.      Discussion**

2   **A.      The Challenged Actions Involved an Element of Judgment or Choice**

3   "[A] prison's internal security is peculiarly a matter normally left to the discretion of

4   prison administrators." *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 2400 n. 14,

5   69 L.Ed.2d 59, 70 n. 14 (1981) (emphasis added). When the potential for violence ripens into

6   actual unrest and conflict, this principle carries special weight. *See Whitley v. Albers*, 475 U.S.

7   312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251, 261–62 (1986) (That deference extends to a

8   prison security measure taken in response to an actual confrontation with riotous inmates, just as

9   it does to prophylactic or preventive measures intended to reduce the incidence of these or any

10  other breaches of prison disciplines); *Miller v. United States*, 1993 WL 137103, at *1 (10th Cir.

11  Apr.23, 1993) (unpublished) (stating that the decisions prison staff make during a fight are the

12  type of decisions the discretionary function exception was designed to shield).

13  **1.   Actions of the Tower Guard**

14  Plaintiff challenges the <u>in</u>action of the tower guard in not shooting when the disturbance

15  was under way.  In Plaintiff's view, the tower guard was mandated to take affirmative action and

16  in failing to do what is mandated, takes this case out of the discretionary function exception.

17  A prison's internal security is normally left to the discretion of prison officials, *Rhodes v.*

18  *Chapman*, 452 U.S. 337, 349 n. 14 (1981), and in this case the actions of the officials in

19  responding to the disturbance were discretionary. There is absolutely no dispute that Plaintiff was

20  hurt during an incident involving two groups of prisoners, which Plaintiff himself characterizes as

21  a gang riot. Plaintiff's complaints arise from spontaneous decisions made during the emergent

22  circumstances of the assault on white inmates. The decisions of prison officials during a fight

23  between two groups of prisoners, by whatever name, and however characterized, remains the type

24  of decision protected by the discretionary function exception to the FTCA. The Court rejects

25  Plaintiff's contention that the tower guard must take some kind of affirmative action during a riot,

26  and has no discretion, particularly where, as here, ground security forces were attempting to gain

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    brief is not authorized, the Court has reviewed the brief.

1  control over the riot.[10]  (See ECF No 18-2, Decl Gerald Del Re ¶6; Decl. Joshua Brown ¶4

2  (orders were given to inmates, and then two deployment of OC pepper spray saturating the area.))

3  Actions or inactions taken during a riot is a quintessential act within the discretionary function

4  exception.

5      Plaintiff contends that the tower guard's decisions to use no force was based on

6  discriminatory reasons.  Plaintiff presents evidence that the tower guard was overheard telling

7  Plaintiff that "I don't think you would have shot into your own people either." Plaintiff attributes

8  racial discriminatory intent for failing to use some force.

9      The discretionary function exception precludes claims against the United States which are

10  "based upon the exercise or performance or the failure to exercise or perform a discretionary

11  function or duty on the part of a federal agency or an employee of the Government, **whether or**

12  **not the discretion was abused**." 28 U.S.C. § 2680(a) (emphasis added). However, "[i]n general,

13  .. .  the Constitution can limit the discretion of federal officials such that the FTCA's discretionary

14  function exception will not apply." *Nurse v. United States*, 226 F.3d 996,1002 & n. 2 (9th Cir.

15  2000). Indeed, [f]ederal officials do not possess discretion to violate constitutional rights." *United*

16  *States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir.) (cited in *Nurse*, 226 F.3d at

17  1002), cert. denied, 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988).

18      The Court acknowledges that other courts have held that the discretionary function

19  exception does not insulate the United States from unconstitutional abuses.  *See e.g., Loumiet v.*

20  *United States*, 828 F.3d 935, 944 (D.C. Cir. 2016) (FTCA's discretionary-function exception does

21  not immunizes allegedly unconstitutional abuses of discretion by the government); *Medina v.*

22  *United States*, 259 F.3d 220, 225 (4th Cir.2001) (noting that the starting point of the discretionary

23  function exception analysis is that "federal officials do not possess discretion to violate

24  _____

25  [10] Plaintiff argues that Officer Garcia gave a direct order to "shoot" into his radio headset.  This
   fact is not determinative of this court's jurisdiction.  The evidence establishes that on the ground
26  security forces were converging on the riot where large amounts of OC pepper spray were
   deployed to quell the disturbance by means of a MK-9 pepper spray.  (ECF No 18-2, Decl. Gerald
27  Del Re ¶6.) Plaintiff's witnesses cannot testify to whom Officer Garcia was directing his order to
   "shoot," the tower guard or the officers who ultimately did shoot the pepper spray to quell the
28  riot.

13

1  constitutional rights or federal statutes") (quoting *U.S. Fid. & Guar. Co. v. United States*, 837

2  F.2d 116, 120 (3d Cir.1988)); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir.2000)

3  ("governmental conduct cannot be discretionary if it violates a legal mandate"); see *Raz v. United*

4  *States,* 343 F.3d 945, 948 (8th Cir. 2003) (the FBI's "alleged surveillance activities f[e]ll outside

5  the FTCA's discretionary-function exception" where the plaintiff had "alleged they were

6  conducted in violation of his First and Fourth Amendment rights.")

7      Plaintiff challenges that the reason the tower guard failed to shoot was for discriminatory

8  racial reasons. The focus of the inquiry is not on the agent's subjective intent in exercising the

9  discretion conferred by statute or regulation, but on the nature of the actions taken and on whether

10  they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325, 111 S.Ct.

11  1267, 113 L.Ed.2d 335 (1991). The tower guard's decision to shoot or not to shoot was within the

12  discretion of the tower guard, even if it is arguably an abuse of discretion. Regardless of the

13  purported motivation for failing to shoot, the nature of the action, to deploy force or not,  was

14  within the discretion of the tower guard.  "Further, Courts do not ask whether the alleged federal

15  tortfeasor was in fact motivated by a policy concern, but only whether the decision in question

16  was of the type that policy analysis could inform. *Id.*

17      Further, Plaintiff cannot allege any constitutional violation from the tower guard's

18  decision not to shoot.  Plaintiff does not have a constitutional right to have some kind of force

19  used upon him or upon others for his protection or to have the guard act in a particular manner to

20  protect Plaintiff. Specifically, Plaintiff does not have a constitutional right to have a warning shot

21  fired into a riot or constitutionally entitled to a particular use of force to protect him.  *Ziglar v.*

22  *Abbasi,* 137 S. Ct. 1843, 1857, 198 L.Ed. 2d 290 (2017) (expanding the Bivens remedy is now a

23  disfavored judicial activity). Accordingly, actions or inactions taken during a riot involved an

24  element of judgment or choice within the discretionary function exception.

25          **2.  Locking the Gate**

26      Plaintiff claims that staff closed and locked the gate which precluded any means for the

27  attacked inmates, such as Plaintiff, from retreating.

28      Plaintiff does not cite to any mandatory authorities, regulations or Program Statements,

1    which impose mandatory duties on officers to keep the gates open. Defendant presents evidence

2    that USP Atwater is a high security prison and having locked gates is essential to limit movement

3    of inmates.  (ECF No 18-2, Decl Gerald Del Re ¶3; Decl Joshua Brown ¶2.)  Correctional staff

4    typically lock gates when a disturbance erupts in a large area to contain the disturbance and not

5    allow it to spread. The gate was closed either because it was the end of movement of inmates or

6    because there was a large grouping of inmates, which staff sought to contain.  In either event,

7    closing the gate was an appropriate choice to isolate and contain any subsequent disturbance.

8    (ECF No 18-2, Decl Joshua Brown ¶2.)  Thus, whether to close the gate was a performance of a

9    choice, and in discretion to prevent movement and contain any subsequent disturbance.

10                  **3.   Failure to Patrol**

11           In Plaintiff's first amended complaint, he states that guards were not present during the

12   riot: "During this time there were no recreation staff on Yard 3 (the Yard the riot had occurred

13   on), and there were no Compound staff anywhere in the vicinity of the riot." ( ECF No. 9, p.4.)

14   Plaintiff alleges that there were not enough officers at the area.  In his opposition, rather than

15   claiming the number of officers present was inadequate, he clarifies that staff who were assigned

16   to the recreation yard failed to patrol their assigned areas in violation of their post orders.  Thus,

17   plaintiff claims failure to patrol; staff were not where they were supposed to be located.

18           A number of federal appeals courts have held that the government is not immune from

19   FTCA liability for inmate assaults resulting from prison guards' lazy or careless failure to perform

20   their duties. *See Keller v. United States*, 771 F.3d 1021, 1025-26 (7th Cir. 2014) (denying

21   defendant's motion for summary judgment when it had pointed to "no evidence in the record to

22   contradict [plaintiff's] claims that the guards were simply lazy or inattentive"); *Triestman v. Fed.*

23   *BOP*, 470 F.3d 471, 475-76 (2d Cir. 2006) (per curiam) (denying motion to dismiss and finding

24   that subject-matter jurisdiction existed over plaintiff's claims that prison guards "failed to patrol ...

25   out of laziness or inattentiveness"); *Middleton v. U.S. Fed. BOP*, 658 F. App'x 167, 171-72 (3d

26   Cir. 2016) (per curiam) (vacating dismissal of plaintiff's FTCA failure-to-protect claim arising

27   from prison guard's allegedly acting "lazy, inattentive, and negligent").

28           Plaintiff claims that the prison guards had abrogated their duties entirely.  Plaintiff cites to

15

1    various Program Statements which require staff to be attentive and protect inmates: Program

2    Statements 3000.03 (employees are responsible for the detention, supervision, inspection, care of

3    inmates), 3420.11 (employees are required to remain fully alert and attentive during the duty

4    hours), 550.14 (post orders must clearly state that staff are responsible for supervising inmates).

5    Plaintiff alleges that Officer Ponce, in charge of the crew on the compound that day said, in

6    response to why they were not present, "Oh, we must not have been paying attention."  (ECF

7    No.20, p. 19 of 28.) The government did not provide a specific response to Plaintiff's position.

8    Based upon evidence the Court cannot conclude that the challenged action of failure to patrol

9    involved an element of judgment or choice.  Therefore, the Court cannot conclude as a matter of

10   law at this point that the guards' behavior is shielded by the discretionary function exception.

11          **B. Challenged Action is Type Congress Meant to Protect Under Discretionary**

12   **Function Exception**

13          "Prison administrators ... should be accorded wide-ranging deference in the adoption and

14   execution of policies and practices that in their judgment are needed to preserve internal order and

15   discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct.

16   1861, 1878, 60 L.Ed.2d 447, 474 (1979). That deference "requires that neither judge nor jury

17   freely substitute their judgment for that of officials who have made a considered choice." *Whitley*,

18   475 U.S. at 322, 106 S.Ct. at 1085, 89 L.Ed.2d at 262. *See Buchanan v. United States*, 915 F.2d

19   969, 972 (5th Cir. 1990) (Prison officials' minute-to-minute decision making in the chaotic

20   circumstances of a riot is a classic example of an activity requiring the exercise of discretion- We

21   interpret the general discretionary function in this case as responding to an emergency in a prison

22   under siege by rioting Cuban detainees. Prison officials were required to react swiftly, making

23   many difficult choices in an attempt to stem the tide of violence and destruction.)

24          **1.  Actions of the Tower Guard**

25          The Court agrees with the conclusion is *Ruby*.  The actions (or inaction) of the tower

26   guard during a riot, is the type of function shielded by the discretionary function exception.

27   *Buchanan* 915 F.2d at 972 ("We do not believe that Congress meant for judges, through

28   hindsight, to second-guess such difficult decisions" minute-to-minute decision making in the

1  chaotic circumstances of a riot).  "Neither do we believe that Congress intended to expose the

2  government to tort liability that would place an even greater burden on prison officials during

3  dangerous uprisings and that would increase the complexity of what is already "an extraordinarily

4  difficult undertaking."  *Id.* Accordingly, the actions (or inactions) of the tower guard are shielded

5  by the discretionary function exception.

6         **2.  Locking the Gates**

7   "[T]he nature of the conduct, rather than the status of the actor, ... governs whether the

8  discretionary function exception applies...." *U.S. v. S.A. Empresa de Viacao Aerea Rio*

9  *Grandense*, 467 U.S. at 813, 104 S.Ct. at 2764, 81 L.Ed.2d at 674. A court must ask whether the

10  challenged acts, regardless of the rank of the actor, "are of the nature and quality that Congress

11  intended to shield from tort liability." *Id.*

12      Under 18 U.S.C. § 4042(a)(1), BOP "ha[s] charge of the management and regulation of all

13  Federal penal and correctional institutions." This includes providing "suitable quarters and

14  provid[ing] for the safekeeping, care, and subsistence" of all prisoners. Id. at § 4042(a)(2). BOP

15  officials make a number of different policy choices when evaluating safety and disciplinary

16  measures. *Alfrey v. United States*, 276 F.3d 557, 564-67 (9th Cir. 2002) (federal regulations

17  expressly give prison officials discretion in how to respond to reports of threats by inmates and in

18  how to search cells. Therefore, it must be presumed that the officials' choices in responding to the

19  report of Casto's threat were based in public policy.) BOP officials consider "such factors as

20  economic feasibility, staff allocation, security concerns, and disruption of an inmate's

21  participation in rehabilitation programs." *Palay v United States*, 349 F.3d 418, 428-29 (7th Cir

22  2003) (citations omitted); *Gaubert*, 499 U.S. at 325, 111 S.Ct. at 1275 (the discretionary function

23  exception extends to decisions at the operational level that are in furtherance of governmental

24  policy).

25      The evidence establishes that closing the gate is discretionary function for security

26  purposes within the prison.  Defendant presents evidence that USP Atwater is a high security

27  prison and locked gates is essential to limit movements of inmates.  Correctional staff typically

28  lock gates when a disturbance erupts in a large area to contain the disturbance and not allow it to

1    spread.  "[A] prison's internal security is peculiarly a matter normally left to the discretion of

2    prison administrators." *Rhodes v. Chapman*, 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 2400 n. 14,

3    69 L.Ed.2d 59, 70 n. 14 (1981). The discretionary decision to lock the gates, to contain potential

4    violence, which ultimately erupted is the type of action protected by discretionary function

5    exception.

6         **3.  Failure to Patrol**

7         As stated above, the first prong has not been satisfied on Plaintiff's claim of failure to

8    patrol   Therefore, the discretionary function exception is not invoked by this claim.

9         **C.      Motion to Open Discovery**

10        Plaintiff seeks open discovery to address the issues regarding the discretionary function

11   exception.  (ECF No. 19.)  Plaintiff seeks documents to substantiate his opposition to the Motion

12   to Dismiss that the discretion function exception does not apply.  Plaintiff seeks documents

13   related to the tower officer's conduct on July 24, 2015, all staff memoranda, review reports,

14   incident reports, and performance reviews related to the incident.

15        In light of legal issues resolved and recommended by these Findings and

16   Recommendations, the Court declines to open discovery until any objections are ruled upon by

17   the District Judge.  Once the pleadings are set, and as appropriate following the District Court's

18   review, the Court will open discovery on any of Plaintiff's remaining claims.

19   **VI.   <u>Conclusion and Recommendation</u>**

20        Based on the foregoing, Plaintiff's Motion to Open Discovery (ECF No. 19) is DENIED.

21        For the reasons stated above, IT IS HEREBY RECOMMENDED that Defendant's motion

22   to dismiss (ECF No. 18), be GRANTED in PART and DENIED in PART as follows:

23        1.  DENY the motion to dismiss on Plaintiff's claim for failure-to-patrol; and

24        2.  GRANT the motion to dismiss on all other claims on the ground that the Court lacks

25             subject matter jurisdiction.

26        These Findings and Recommendations will be submitted to the United States District

27   Judge assigned to the case, under 28 U.S.C. § 636(b)(l).  Within **fourteen (14) days** after being

28   served with these Findings and Recommendations, the parties may file written objections with the

Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 1, 2020**                    /s/ *Barbara A. McAuliffe*
                                                 UNITED STATES MAGISTRATE JUDGE

19