# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT BARBOUR,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 1:18-cv-00246-JLT-BAM (PC)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR RULINGS<br>(ECF No. 72)<br><br>ORDER DENYING PLAINTIFF'S MOTION TO COMPEL<br>(ECF No. 62)<br><br>FINDINGS AND RECOMMENDATIONS GRANTING DEFENDANT'S MOTION TO DISMISS<br>(ECF No. 58)<br><br>FINDINGS AND RECOMMENDATIONS DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br>(ECF No. 64)<br><br>**FOURTEEN (14) DAY DEADLINE** |

## I. Introduction

Plaintiff Scott Barbour ("Plaintiff") is a federal prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). This action proceeds on Plaintiff's second amended complaint against Defendant United States of America ("Defendant") on claims regarding failure to patrol the recreation yard and the metal detector prior to a race riot that occurred at United State Penitentiary Atwater on July 24, 2015. (ECF No. 56.)

On November 10, 2021, Defendant filed a motion to dismiss the metal detector claim for lack of subject matter jurisdiction pursuant to the discretionary function exception to the FTCA,

1

28 U.S.C. § 2680(a).  (ECF No. 58.)  Plaintiff filed an opposition on December 13, 2021, (ECF No. 59), and Defendant filed a reply on December 16, 2021, (ECF No. 60).

On January 10, 2022, Plaintiff filed a motion to compel discovery.  (ECF No. 62.)  Defendant filed a response on January 25, 2022, (ECF No. 63), and Plaintiff filed a reply on February 11, 2022, (ECF No. 65).

During the pendency of these motions, Defendant filed a motion for summary judgment to dismiss both claims on the grounds that there are no genuine issues as to any material fact that the United States, the Bureau of Prisons, or any of its employees failed to patrol or was negligent in any manner.[1]  (ECF No. 64.)  Plaintiff filed an opposition on March 7, 2022, (ECF No. 66), and Defendant filed a reply on March 22, 2022, (ECF No. 67).

On March 14, 2024, Plaintiff filed a motion for rulings on the pending discovery and dispositive motions.  (ECF No. 72.)  Defendant did not file a response, and the motion is deemed submitted.  Local Rule 230(l).  The motion for rulings is granted by the instant order and findings and recommendations.

The aforementioned discovery and dispositive motions are now fully briefed and before the Court for decision.[2]  For the reasons set forth below, Plaintiff's motion to compel is denied.  The Court further recommends that Defendant's motion to dismiss be granted as to the metal detector claim, and Defendant's motion for summary judgment be denied as to the failure to patrol claim.

**II.      Plaintiff's Motion to Compel Discovery**

  **A.      Parties' Positions**

Pursuant to the Court's March 25, 2021 discovery and scheduling order, the deadline for completion of all discovery, including filing all motions to compel discovery, was November 25, 2021. (ECF No. 48.)  In his motion to compel, Plaintiff states that he sent written discovery

---

[1] Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment.  (ECF No. 64, pp. 2–3.); *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411–12 (9th Cir. 1988).

[2] These motions were dropped inadvertently by the Court's CM/ECF reporting/calendaring system resulting in the prolonged delay in resolution.

2

1  requests to Defendant on March 29, 2021, and received Defendant's response on June 1, 2021.

2  (ECF No. 62.) Plaintiff sent meet and confer letters regarding Defendant's responses on June 7

3  and July 22, 2021, and Defendant responded by letter dated August 25, 2021. Plaintiff then filed

4  a motion to compel, signed and dated November 17, 2021 and including a certificate of service

5  indicating that the motion was sent via first-class mail to defense counsel on November 17, 2021.

6  (*Id.* at 16, 65.) However, the motion was not received and filed with the Court until January 10,

7  2022. (*Id.* at 1.)

8  In opposition, Defendant primarily argues that the motion should be denied as untimely

9  filed, and Plaintiff also waited four months after Defendant responded to Plaintiff's meet and

10  confer letter before filing the motion. (ECF No. 63.) Defendant requests the opportunity to

11  address the merits directly should the Court choose to entertain the motion as timely filed. (*Id.*)

12  Plaintiff replies that he submitted the motion to compel to prison staff for mailing on

13  November 17, 2021, more than a week prior to the discovery deadline. (ECF No. 65.) However,

14  Plaintiff alleges that there was some sort of snafu at the Clerk's Office, because in mid-December

15  2021 he received a packet of documents from the Clerk's Office, unrelated to the instant action,

16  with a notice that the documents could not be filed because they did not contain a case number.

17  Plaintiff, suspecting that his motion to compel had not been filed, had a friend check on PACER

18  and discovered the motion had not been filed. Plaintiff immediately resubmitted the motion with

19  a letter explaining the apparent mix-up, along with a copy of the documents erroneously sent to

20  Plaintiff, and a request for the Clerk to file his explanatory letter with the motion to compel.[3] As

21  Plaintiff submitted the motion to compel to prison staff for mailing prior to the discovery

22  deadline, under the prison mailbox rule his motion should be deemed to have been filed on that

23  date. (*Id.*)

24  **B.    Discussion**

25  Plaintiff is correct that, pursuant to the prison mailbox rule, a pleading filed by a *pro se*

26  prisoner is deemed to be filed as of the date the prisoner delivered it to the prison authorities for

27

28  [3] Plaintiff provides a similar explanation in his opposition to Defendant's motion for summary judgment, (ECF No. 66, p. 3), and in his motion for rulings, (ECF No. 72, pp. 5–8).

3

1  mailing to the court clerk.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988); *Douglas v. Noelle*,
2  567 F.3d 1103, 1108–09 (9th Cir. 2009) (mailbox rule articulated in *Houston* applies to civil
3  rights actions).  Plaintiff's motion to compel, though received by the Court on January 10, 2022,
4  includes Plaintiff's signature and certificate of service indicating that it was mailed on November
5  17, 2021.  (ECF No. 62, pp. 16, 65.)  However, despite Plaintiff's assertion in his reply brief, the
6  motion to compel did not include any explanatory letter regarding Plaintiff's first attempt to mail
7  the motion to compel in November.  As there is no indication, aside from Plaintiff's later
8  statements, that Plaintiff actually mailed his motion to compel before the close of discovery, the
9  motion to compel, filed January 10, 2022, is untimely.

10   Even accepting as true Plaintiff's assertion that he originally mailed his motion to compel
11  in November 2021, Plaintiff has not demonstrated that he exercised due diligence by mailing a
12  motion to compel only a week before the close of discovery.  Plaintiff confirms that he received
13  Defendant's response to his meet and confer letters in August 2021, but does not explain why he
14  then waited until November 2021 to submit a motion to compel.  Finally, Plaintiff does not
15  argue—either in the motion to compel or in his opposition to the pending motion for summary
16  judgment—that the documents sought in the motion to compel are necessary for Plaintiff to
17  demonstrate a dispute of fact in opposition to Defendant's motion for summary judgment.  Based
18  on the foregoing, the motion to compel is denied.

19  **III.   Defendant's Motion to Dismiss Metal Detector Claim**
20       **A.       Legal Standards**
21              1.       Lack of Subject Matter Jurisdiction
22   "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co*.,
23  511 U.S. 375, 377 (1994).  Federal Rule of Civil Procedure 12(b)(1) allows a defendant to raise
24  the defense, by motion, that the court lacks jurisdiction over the subject matter of an entire action
25  or of specific claims alleged in the action.  "A motion to dismiss for lack of subject matter
26  jurisdiction may either attack the allegations of the complaint or may be made as a 'speaking
27  motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Publ'g Co. v.*
28  *Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

When a Rule 12(b)(1) motion attacks the existence of subject matter jurisdiction, no presumption of truthfulness attaches to the plaintiff's allegations. *Thornhill Publ'g Co.,* 594 F.2d at 733. "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). When a Rule 12(b)(1) motion attacks the existence of subject matter jurisdiction in fact, plaintiff has the burden of establishing that such jurisdiction does in fact exist. *Thornhill Publ'g Co.,* 594 F.2d at 733.

A Rule 12(b)(1) motion will be granted if the complaint, when considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039–40 n.2 (9th Cir. 2003); *Thornhill Publ'g Co.*, 594 F.2d at 733. Challenges to jurisdiction under Rule 12(b)(1) may be facial (i.e., on the pleadings) or factual, permitting the court to look beyond the complaint. *Savage*, 343 F.3d at 1039–40, n.2; *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a factual challenge, "the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy*, 850 F.2d at 560; *see also Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983) (consideration of material outside the pleadings did not convert a Rule 12(b)(1) motion into one for summary judgment).

### 2.     Federal Tort Claims Act

The FTCA provides for recovery of money damages against the United States for cognizable state or common law torts committed by federal officials while acting within the scope of their employment. 28 U.S.C. §§ 1346(b), 2674. The FTCA provides that the United States shall be liable in tort suits "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. It is the exclusive waiver of sovereign immunity for suits against the United States sounding in tort. 28 U.S.C. § 1346(b).

The FTCA can extend tort liability to the U.S. government if the facts show that the actions taken amount to negligence under state law. Under California law, negligence is established if the plaintiff can show that his injury is a result of the defendant's breach of a duty

of care. *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 294 (1988).

### 3. The Discretionary Function Exception ("DFE")

However, the FTCA waiver of immunity is inapplicable to a claim based on the exercise of a discretionary function on the part of a federal agency or employee. *Childers v. United States*, 40 F.3d 973, 974 (9th Cir. 1995) (citing 28 U.S.C. § 2680(a)); *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). This is true "whether or not the discretion is abused." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). In creating the discretionary function exception, Congress "wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984).

Under the discretionary function exception, the government retains sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court established a two-step inquiry to determine whether the discretionary function exception applies. *See Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988). "First, a court examines whether the government's actions are 'discretionary in nature, acts that involv[e] an element of judgment or choice.'" *Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015), *cert. denied* 136 S.Ct. 2008 (2016) (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). "If there is . . . a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when an employee has no rightful option but to adhere to the directive." *Id.* (quoting *Terbush*, 516 F.3d at 1129). Second, "a court must determine whether that judgment is of the kind that the discretionary function was designed to shield." *Berkovitz*, 486 U.S. at 536. "To survive a motion to dismiss, [a plaintiff] must 'allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Terbush*, 516 F.3d at 1130 (emphasis omitted) (quoting *Gaubert*, 499 U.S. at 324–25). "The focus of the

1    inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or

2    regulation, but on the nature of the actions taken and on whether they are susceptible to policy

3    analysis." *Gaubert*, 499 U.S. at 325.

4        Congress expressly reserved the sovereign immunity of the United States as to such

5    claims, and therefore, federal courts lack jurisdiction over any claim to which the discretionary

6    function applies. *Alfrey v. United States*, 276 F.3d 557, 561 (9th Cir. 2002). Although the

7    plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, the

8    government bears the burden of establishing that the discretionary function applies. *Sabow v.*

9    *United States*, 93 F.3d 1445, 1451 (9th Cir. 1996); *Miller*, 163 F.3d at 594.

10       **B.**    **Parties' Positions**

11       The second amended complaint alleges that the United States Penitentiary Atwater ("USP

12   Atwater") Unit 2-A housing unit officers on duty on July 24, 2015 were negligent in failing to

13   remain attentive and supervise the walk-through metal detector during the 12:10 p.m. recreation

14   move, enabling several Hispanic inmates, including the Hispanic inmate who subsequently

15   stabbed Plaintiff, to set off the metal detector and yet proceed to the recreation yard without being

16   stopped and searched by staff.

17       Defendant United States asks the Court to dismiss Plaintiff's metal detector claim for lack

18   of subject matter jurisdiction pursuant to the discretionary function exception to the FTCA, 28

19   U.S.C. § 2680(a), because there are no regulations or policies that govern the supervision of metal

20   detectors in the prison. The prison's decisions regarding where to place staff and when to

21   monitor a metal detector are staffing decisions involving an element of judgment or choice.

22   There is no statute, regulation, policy, or post order that dictates when prison staff must monitor a

23   metal detector in a housing unit in any given situation, and Plaintiff has cited no post order,

24   regulation, or rule which required BOP staff to monitor a metal detector in the housing unit at

25   USP Atwater on July 24, 2015. The challenged action is of the type Congress meant to protect

26   under the DFE, as it involves a decision susceptible to social, economic, or political policy

27   analysis. The unit staff did not violate any post order by patrolling the courtyard instead of the

28   metal detector and were within their discretion.

7

In opposition, Plaintiff contends that the only relevant question is whether or not there are any post orders, regulations, or policies that require staff to remain attentive and to supervise the inmates, not whether there are specific post orders, regulations, or policies that require staff to monitor the prison metal detectors. The BOP Program Statements cited in Plaintiff's prior pleadings require staff to remain attentive and to supervise inmates, and apply with equal force to Plaintiff's failure to patrol and failure to supervise the metal detector claim. Plaintiff's claim is that staff failed to remain attentive and supervise the inmates walking through the unit metal detector, and that failure permitted numerous Hispanic inmates to proceed from the housing unit to the recreation yard with homemade metal knives, which were used to stab other inmates, including Plaintiff.

Defendant argues in reply that Plaintiff's opposition does not provide a meaningful distinction. BOP staff made a decision not to monitor the metal detector at the relevant time, and were within their discretion to be monitoring the courtyard. They were not out of position, and the decision not to monitor the metal detector is protected by the DFE because BOP staff were within their discretion.

**C.    Discussion**

1. Challenged Action Involved Element of Judgment or Choice

"[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981). That deference extends to prison security measures taken in response to an actual confrontation with riotous inmates as well as to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

Plaintiff contends that BOP staff violated BOP Program Statements that required staff to remain attentive and supervise inmates when they failed to remain attentive to and supervise the inmates walking through the unit metal detector and activating the metal detector with homemade metal knives that were later used to stab Plaintiff. Plaintiff argues that because of the requirement to remain attentive and supervise inmates, it is irrelevant whether there are specific post orders or regulations requiring staff to monitor the prison metal detectors.

8

Despite Plaintiff's attempt to equate the staffing of the metal detectors with patrolling the recreation yard, the Court finds that these claims are distinguishable. The cited Program Statements provide only that staff must remain attentive and supervise inmates, but it does not specify where or how such attention and supervision must be conducted. Plaintiff contends that in order to be attentive and supervise inmates, BOP staff were then required to monitor the metal detectors. But the *choice* of whether to monitor the metal detectors, as opposed to some other location such as the courtyard, was within the discretion of BOP staff. This claim is unlike Plaintiff's failure to patrol claim, where Plaintiff alleges that BOP staff entirely abrogated their duties by failing to patrol their assigned areas, in violation of their post orders. (*See* ECF No. 26, pp. 15–16.) Thus, the decision not to monitor the metal detectors involved an element of judgment or choice within the discretionary function exception.

## 2. Challenged Action is Type Congress Meant to Protect Under DFE

"Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). That deference "requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 322.

Under 18 U.S.C. § 4042(a)(1), BOP "ha[s] charge of the management and regulation of all Federal penal and correctional institutions." This includes providing "suitable quarters and provid[ing] for the safekeeping, care, and subsistence" of all prisoners. *Id.* at § 4042(a)(2). BOP officials make a number of different policy choices when evaluating safety and disciplinary measures. *Alfrey v. United States*, 276 F.3d 557, 564–67 (9th Cir. 2002) (federal regulations expressly give prison officials discretion in how to respond to reports of threats by inmates and in how to search cells. Therefore, it must be presumed that the officials' choices in responding to the report of Casto's threat were based in public policy). BOP officials consider "such factors as economic feasibility, staff allocation, security concerns, and disruption of an inmate's participation in rehabilitation programs." *Palay v United States*, 349 F.3d 418, 428–29 (7th Cir. 2003) (citations omitted); *Gaubert*, 499 U.S. at 325 (the discretionary function exception extends

9

to decisions at the operational level that are in furtherance of governmental policy).

The evidence establishes that BOP post orders do not mandate when BOP staff must monitor the metal detectors in the housing unit. (ECF No. 58-2, ¶ 4.) BOP unit officers may exercise discretion as to when to monitor the metal detectors or whether to be present in the courtyard or elsewhere in the unit to attend to various tasks. (*Id.*) Unit officers are under no obligation to investigate a triggered alarm on an unmanned metal detector, even if heard from a distance. (*Id.*) Defendant presents evidence that post orders for housing unit officers call for random and frequent patrols of the unit throughout the shift and regular searches of areas and inmates to locate contraband and deter its introduction and movement. (*Id.* ¶ 7.) The post orders do not require mandatory and specific actions to effectuate searches or specify entrance and/or exit procedures as inmates move to and from housing units, and therefore creates the type of day-to-day decision that falls within the discretionary function exception, utilizing the staff member's judgment as needed to preserve internal order and discipline and maintain institutional security. (*Id.*) The discretionary decision to patrol elsewhere in the courtyard to maintain internal security, rather than to monitor the metal detectors or investigate the metal detector alarm, is the type of action protected by the discretionary function exception. It is not for the Court to substitute its judgment for that of officials who made a considered choice in whether to monitor the metal detectors during the relevant time.

The Court therefore recommends dismissal of Plaintiff's metal detector claim for lack of subject matter jurisdiction.

**IV.    Defendant's Motion for Summary Judgment on Failure to Patrol Claim**

      **A.    Legal Standard**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

11

1  *aff'd*, 810 F.2d 898 (9th Cir. 1987).

2  In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**B. Discussion**

1. Undisputed Material Facts ("UMF")[4]

1. Plaintiff Scott Barbour ("Plaintiff") is a federal prisoner designated to the United States Penitentiary in Atwater, California ("USP Atwater") from July 22, 2015 until August 2017. (ECF No. 56 (Second Am. Compl. ("SAC")); ECF No. 64-3 ("Lodge Decl."), Ex. 1 (Transcript of Deposition of Scott Barbour ("Barbour Depo.")), 10:1–9.)

2. On July 24, 2015, just two days after arriving at USP Atwater, Plaintiff (who is white) was involved in a "race riot." (SAC at 3; Barbour Depo., 19:10–12.)

3. On July 24, 2015, at about 10:00 a.m. during morning recreation, Plaintiff learned of a dispute between rival prison gangs, consisting of white inmates and Hispanic inmates. (Barbour Depo., 18:16–25.)

4. At approximately 12:10 p.m., Plaintiff left his housing unit, Unit 2-A, to attend outdoor recreation. As Plaintiff exited Unit 2-A, the two officers assigned to the unit were in the courtyard talking to officers from another unit. (*Id.* at 27:21, 75:22–25.)

///

---

[4] *See* Statement of Undisputed Material Facts in Support of United States' Motion for Summary Judgment, (ECF No. 64-2), and Statement of Disputed Material Facts in Opposition to United States' Motion for Summary Judgment, (ECF No. 66, pp. 22–24). Plaintiff's Statement of Disputed Material facts addresses only Defendant's Undisputed Material Facts Nos. 7, 8, 16, 18, 24, and 29. (*See* ECF No. 66, pp. 22–24.) As a result, the remainder of Defendant's Statement of Undisputed Material Facts is accepted except where brought into dispute by Plaintiff's verified complaint and the portions of his opposition to the motion for summary judgment signed under penalty of perjury. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence); *Johnson v. Meltzer*, 134 F.3d 1393, 1399–1400 (9th Cir. 1998) (same, with respect to verified motions). Unless otherwise indicated, disputed and immaterial facts are omitted from this statement and relevant objections are overruled.

5. The unit officers were not monitoring the metal detector located outside the unit in the "sally port" (a pass-through hallway between the interior and exterior unit door). They were not anywhere near the metal detector. As a result, inmates were allowed to pass through the metal detectors without removing metal objects such as rings, watches, and radios. (*Id.* at 75:1–25, 78:3–14; SAC, Ex. B ("Jordan Decl."), p. 15.)

6. Neither Plaintiff nor his witness, Inmate Mark Jordan, saw any weapons. Inmate Jordan heard the alarm sound on the unmonitored metal detector but he did not report anything suspicious. (Barbour Depo., 76:1–12 (Plaintiff did not see weapons); 78:12–14 (staff did not see weapons); *see also* Jordan Decl.)

7. There were no post orders specifically requiring unit officers to monitor the metal detectors. (Barbour Depo., 73:2–9.)

8. At approximately 12:12, Plaintiff entered the outdoor recreation area on Yard 3, close to the gate. As he hung his duffle bag on the fence and began to exercise, he heard an "African-American inmate" tell his friend who had started to go on Yard 3 from Yard 2, "Don't go over there [referring to Yard 3], some stuff's going on." (*Id.* at 28:1–30:25, 32:14–33:22.)

9. Plaintiff became aware that something might be going on. He looked up and noticed 100–125 "Paisas" in the center of Yard 3. He also noticed a smaller group of white inmates in the southwest section of Yard 3. (*Id.* at 32:16–22, 111:14–16, 30:21–25.)

10. There was no staff in the vicinity of the gathering. (*Id.* at 34:1–24; *see also* Jordan Decl., pp. 15–16.)

11. Despite all these warnings, Plaintiff and his cellmate, Inmate Jordan, chose to go to the group of white inmates "to find out what was going on." (Barbour Depo., 33:9–15.)

12. At approximately 12:15, Plaintiff joined the group of white inmates. He chose to join the white group because he identified more closely with white inmates than Hispanic inmates. (*Id.* at 36:1–23, 36:24–37:2.)

13. Plaintiff was under no obligation to go to Yard 3 where the other inmates were gathering; he could have walked away onto Yard 2 or Yard 1. (*Id.* at 29:4–30:3.)

1   14. Plaintiff believed the gathering was prohibited. (*Id.* at 31:1–14.)

2   15. Plaintiff believed the gathering was for no good. (*Id.* at 112:8–11.)

3   16. Plaintiff saw Hispanic inmates dig up weapons and hand them out to some of the members
4       of their group. (*Id.* at 39:18–23; 40:7–9.)

5   17. There was no Bureau of Prisons ("BOP") staff in the area. BOP staff was not aware of
6       any problem. (*Id.* at 34:1–14, 39:24–40:5, 34:14–25.)

7   18. Staff were patrolling elsewhere and were not in the area. (ECF No. 62, Pl.'s Mot. to
8       Compel, Ex. C, pp. 51–54 (still frames of officers patrolling elsewhere in the recreation
9       yard at the relevant time); *see also* Barbour Depo., 94:3–19; ECF No. 18-2, Brown Decl.;
10      ECF No. 27-1, Garcia Decl.; ECF No. 58-2, Zaragoza Decl.)

11  19. The recreation yard is large and Yard 3 is the size of a city block. (Barbour Depo., 29:4–
12      19.)

13  20. At 12:25 the Hispanic group advanced. They picked up cans of soda iced in plastic trash
14      bags which they typically sold on the yard. (*Id.* at 44:21–45:2, 46:23–24; Jordan Decl., p.
15      15 ("at approximately 12:23, the Paisa began to advance on the white inmates").)

16  21. At 12:27, the Hispanic group began throwing cans of soda at the white inmates. (Barbour
17      Depo., 49:6–9; Jordan Decl., p. 15.)

18  22. Plaintiff was not hit with any sodas, but he did pick up five or six of the cans and threw
19      them back at the Hispanics. (Barbour Depo., 62:12–25.)

20  23. At 12:31, Officer McIntyre noticed the soda throwing. He reacted immediately to close
21      the gate and radioed for help. Officer McIntyre was the closest BOP staff member to the
22      incident when it started. At the time, Officer McIntyre was engaged with his back to the
23      two groups of inmates talking to an inmate through the gate between Yard 2 and Yard 3
24      where recreation equipment such as soccer balls are disbursed. (*Id.* at 49:17–21, 50:23–
25      51:4, 51:13–52:5. *See also id.* at 34:3–10, 113:1–22, 94:18–95:12.)

26  24. Immediately after Officer McIntyre reacted, the Paisas made first "full scale attack"
27      between the two groups. The Paisas threw punches at the white inmates and used the
28      shanks or illegal homemade weapons they dug up in the yard. The Paisas had more

weapons than what they dug up in the yard. (*Id.* at 50:16–19, 52:2–13, 63:4–17.)

25. Between 12:36–12:38 additional BOP staff arrived armed with pepper spray. They used the pepper spray to quell the violence. (*Id.* at 55:25, 57:6–23.)

26. By 12:41, all of the inmates were on the ground and the riot was quelled. (*Id.* at 57:5–11, 57:19–23.)

27. BOP staff responded quickly, professionally and, as a result, prevented greater injury to inmates. (*Id.* at 99:16–100:7.)

28. No one at BOP had advance warning that inmates planned violence that day. (*Id.* at 60:2–23; Lodge Decl., ¶ 6.)

    2. Parties' Positions[5]

Defendant contends that to succeed on his FTCA claims, Plaintiff must establish negligence under California law, which has four required elements: (1) duty; (2) breach; (3) causation; and (4) damages. Plaintiff knowingly and willfully joined the inmates in the race riot, and his own actions and those of other inmates were the sole cause of Plaintiff's injuries. BOP was not the cause of Plaintiff's injuries. The undisputed evidence shows that BOP staff performed within their discretion and did not fail to patrol. There is no evidence that BOP failed to provide "reasonable" safety from "foreseeable harm." Neither the race riot nor Plaintiff's participation in the race riot was foreseeable. Plaintiff's claims are based upon speculation and his own lay opinions regarding the duties of a correctional officer. The alleged statement by Officer Ponce is not admissible evidence[6] and does not create an inference of negligence. BOP staff was well-positioned and quelled the riot within minutes.

///

---

[5] In light of the recommendation to grant Defendant's motion to dismiss the metal detector claim, *supra*, section III, the Court addresses only those arguments related to Plaintiff's failure to patrol claim.

[6] To the extent Defendant objects to Defendant Ponce's statement as hearsay, the objection is overruled. Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." *Calmat Co. v. U.S. Dep't of Labor*, 364 F.3d 1117, 1124 (9th Cir. 2004). At this stage, the Court did not find the hearsay objection raised to be preclusive of the evidence submitted.

In opposition, Plaintiff argues that BOP was the cause of Plaintiff's injuries, because but for their failure to patrol, remain attentive, and supervise inmates, Plaintiff would not have been stabbed by other inmates. Plaintiff could not have avoided the situation, as the attack took place throughout the institution, the white inmates were in the corner of Yard 3 approximately 50 yards from the only escape gate and would have run into the attacking inmates if they tried to flee, and Officer McIntyre had locked the only gate. Plaintiff's attached medical records show that he was stabbed in the right knee during the attack and that his PTSD was caused by the attack. Plaintiff has submitted credible direct evidence that BOP staff failed to patrol, failed to remain attentive, and failed to supervise the inmates, while Defendant has presented no evidence to refute any of Plaintiff's evidence. The attack was foreseeable, and could have been avoided if the tower guard had realized that things in Yard 3 were not normal at 12:12 p.m. instead of 12:35 p.m. If the compound officers had been patrolling the compound, they would have seen at 12:12 p.m. what the tower guard saw at 12:35 p.m. Despite Defendant's assertions, Plaintiff did not admit that BOP staff were patrolling consistent with all post orders and regulations.

Defendant contends in reply that Plaintiff is the cause of his own injuries, as a knowing participant in the race riot. As BOP had no advance notice of the race riot, which involved multiple criminal acts, it was unforeseeable that Plaintiff—who had been at USP Atwater only two days, did not belong to a gang, and was aware of the danger on the yard—would join the group and participate in the violence. Prison officials had no duty to shield Plaintiff from an unforeseen unintentional attack. BOP should not be held the guarantor of an inmate's safety in spite of his own actions. Plaintiff cannot establish that BOP failed to patrol, as there is no law, rule, or regulation that required BOP to patrol the large, open area of Yard 3 at the exact time and place of the race riot. Plaintiff's claim of failure to patrol is not actually inattention, but rather the staff's decisions regarding where to patrol. Given BOP's response time to quell the riot, it is virtually impossible that the level of laziness or inattentiveness required to be actionable could have occurred in the 15–20 minute time-span described by Plaintiff. In addition, Plaintiff's claims are based on his own unfounded allegations, arguments, and lay opinions, inadmissible evidence or expert opinions. Plaintiff has not designated an expert regarding the standard of care,

and Plaintiff cannot rely on the doctrine of negligence *per se* or *res ipsa loquitur* to excuse his lack of evidence.

### 3. Analysis

On the record before the Court, there remain significant disputes of fact that cannot be resolved on summary judgment.

#### a. *BOP Post Orders*

Defendant repeatedly asserts that staff post orders do not require the patrolling of specific areas in the institution, and therefore it was within their discretion not to patrol the area around Yard 3 at the time of the race riot. Defendant contends that Plaintiff's arguments to the contrary are solely based on speculation and Plaintiff's lay opinion, and not sufficient to create a dispute of fact.

However, Defendant's own evidence in support of the motion for summary judgment creates ambiguity as to the requirements of the post orders of the compound officers. In reference to these post orders, Associate Warden Garcia declares that, "[w]ith certain exceptions not relevant here, including prisoner movements and counts, the post orders do not require staff to patrol any particular location." (ECF No. 27-1, ¶ 5 (emphasis added).) While the attached redacted post orders for the Compound #1 post for July 24, 2015—a Friday—provide that the area of responsibility for Compound #1 encompasses "ALL INTERNAL INSTITUTION AREAS," (*id.* at 6), it further specifies that "Activities movement to Yard/ Programs, (Jumah prayer on Fridays)" occurs at 12:30 p.m. on weekdays, (*id.*, p. 7). Lieutenant Brown declares that on July 24, 2015 at approximately 12:30 p.m., he was on duty "during a yard move (meaning a short period during which inmates are allowed to enter or leave the yard," clarifying that "[t]he gate is only kept open during a move, and is secured at all other times." (ECF No. 18-2, p. 5.)

It is undisputed that at 12:30 p.m. on July 24, 2015, the gate between Yard 2 and Yard 3 was open, and inmates were being allowed to enter or leave the yards for recreation. UMF 4, 8, 23. It is also undisputed that there were no staff in the area of Yard 3. UMF 17, 18. Despite the Associate Warden's assertion to the contrary, the evidence before the Court suggests that the race riot occurred during "prisoner movement," a situation during which post orders do require staff to

patrol a particular location.  (ECF No. 27-1, p. 7.)  To the extent there are differences between the terms "prisoner movement" as used in Associate Warden Garcia's declaration and "activities movement" as used in the Compound #1 post orders, the Court finds no evidence in the record making any such distinction, and any ambiguities are to be resolved in favor of the non-moving party.  *See Anderson*, 477 U.S. at 255.  Accordingly, based on the evidence before the Court, there remains a dispute of fact regarding whether BOP staff were in violation of their post orders when they were not patrolling in the vicinity of Yard 3 on July 24, 2015.

b.      *Plaintiff's Participation in the Race Riot*

There is also a dispute of fact as to whether BOP staff or Plaintiff caused Plaintiff's injuries during the race riot.  Plaintiff contends that BOP staff's negligence in preventing the race riot led to his injuries, while Defendant asserts that Plaintiff willingly chose to join the white inmates who participated in the race riot and possibly escalated the violence by throwing sodas back at the Hispanic inmates.  Plaintiff declares, under penalty of perjury, that he believes that if he had tried to leave Yard 3 prior to the attack, he would have either been attacked before leaving the yard, or attacked on Yard 2 by the Hispanic gang members coming to join their fellow gang members on Yard 3.  (ECF No. 66, p. 57.)  Plaintiff therefore felt it would be safer to stay with the group.  (*Id.*)  Plaintiff states that when the Mexican group started throwing sodas at the white group, he threw sodas back at them "to try to keep them at bay," and strictly as a defensive measure.  (Barbour Depo., 49: 11–14; ECF No. 66, p. 14.)  Plaintiff's evidence is based on his personal knowledge and beliefs regarding the events at the time, and the fact that his stated motivations behind his actions at the time differ from those suggested by Defendant is sufficient to create a dispute of fact.

c.      *Cause of Plaintiff's Injuries*

Defendant argues that Plaintiff's injuries were caused by his own actions, and that there is no causal connection between the incident and Plaintiff's knee injury or PTSD.  Plaintiff attaches excerpts of medical records from after the race riot, noting Plaintiff's recovery from a July 24, 2015 stab wound to his right knee, (ECF No. 66, pp. 28–34), as well as his symptoms associated with PTSD following the July 2015 incident, (*id.* at 35–39).  Defendant did not substantively

respond to Plaintiff's opposition with respect to this argument, (*see* ECF No. 67), and therefore the Court finds that Plaintiff has provided sufficient evidence to create a dispute of fact as to the causation of his right knee injury and PTSD.

### d. *Foreseeability of Race Riot*

Defendant asserts that no BOP staff could have anticipated the race riot or Plaintiff's participation in the race riot, because staff had no advance warning that inmates planned violence that day. The inmates concealed their weapons and intent to riot from BOP and selected a time and place away from patrolling BOP staff and where it was difficult for BOP staff to detect. Plaintiff does not dispute that BOP did not have advance warning that inmates planned violence, UMF 28, but rather that staff failed to patrol at the time of the race riot, thus preventing them from noticing the gathered inmates who were digging up weapons in the yard. In light of the above finding that there is a dispute of fact regarding whether post orders required staff to patrol the inmates as they moved between the recreation yards, the Court finds that both Defendant's and Plaintiff's arguments here are based on speculation. It is undisputed that no BOP staff were patrolling the area of Yard 3 at that time. UMF 17, 18. Plaintiff provides his lay opinion that staff, if present, could have prevented the race riot from occurring. Defendant provides expert opinions regarding the appropriateness and speed with which BOP staff contained and quelled the race riot, but which otherwise assert that staff acted within their discretion regarding where to patrol and chose not to patrol the area of Yard 3. Any argument that staff, if present in the vicinity of Yard 3, could not have prevented the race riot or quelled the violence any more quickly, is speculative.

Finally, while Defendant concludes that Plaintiff's participation in the riot was unforeseeable given his recent arrival at the institution and lack of any gang affiliation, Plaintiff asserts that he was attacked based solely on his race, rather than due to a particular enemy or gang affiliation. Whether his participation in the race riot was knowing and voluntary or as a result of self-defense also remains disputed, *see supra*, section IV.B.3.b. The Court therefore finds that there remains a dispute of fact regarding the foreseeability of the race riot and any injuries Plaintiff sustained as a result.

**V.      Order and Recommendations**

Based on the foregoing, IT IS HEREBY ORDERED as follows:

1. Plaintiff's motion for rulings, (ECF No. 72), is GRANTED; and
2. Plaintiff's motion to compel discovery, (ECF No. 62), is DENIED.

\* \* \*

Furthermore, IT IS HEREBY RECOMMENDED as follows:

1. Defendant's motion to dismiss, (ECF No. 58), be granted and Plaintiff's metal detector claim be dismissed for lack of subject matter jurisdiction; and
2. Defendant's motion for summary judgment, (ECF No. 64), be denied as to Plaintiff's remaining claim of failure to patrol.

\* \* \*

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 12, 2024**                    /s/ *Barbara A. McAuliffe*  
                                                                UNITED STATES MAGISTRATE JUDGE